


Raymond H. Pierson, III, M.D.
813 Court Street, Suite #1
Jackson, CA 95642
Telephone: (209) 257-0513
Facsimile: (209) 257-0516

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Raymond H. Pierson, III, M.D., Pro Se<br>813 Court Street, Suite #1<br>Jackson, CA 95642<br><br>Plaintiff,<br><br>vs.<br><br>Bruce S. Rogow, J.D.; Bruce S. Rogow, PA<br>500 East Broward Blvd., Suite 1930<br>Fort Lauderdale, FL 33394<br><br>Cynthia Gunther, J.D.<br>Gunther Law, LLC<br>1 East Broward Blvd. Ste 700<br>Fort Lauderdale, FL 33301-1876<br><br>And Does 1 through 5, inclusive, | CASE NO. :<br>**2:14 - CV - 0 3 2 4 KJM CKD PS**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

1. Raymond H. Pierson, III, M.D. ("Dr. Pierson") files this original complaint and demand for jury trial against Bruce S. Rogow, J.D., Bruce S. Rogow, P.A., Cynthia Gunther, J.D., and Does 1 through 5 (hereinafter Rogow and Associates will be referred to as "Rogow, et.al.") for legal malpractice, negligence, and breach of fiduciary duty as follows:

#### SECTION I. NATURE OF THE ACTION

2. This action arises from the negligence, legal malpractice, and breach of fiduciary duty of Rogow, et.al and Associates in representing Dr. Pierson on appeal of case # 10-15496 in the United States Court of Appeals for the 11th Circuit. In that action Attorney Rogow represented Dr. Pierson in the appeal of underlying case # 6:08-CV466-0RL-28GJK

which was dismissed through a series of dismissals and final summary judgment granted on October 27, 2010 by United States District Judge John Antoon, II in the United States District Court, Middle District of Florida, Orlando Division (Doc. 364). This present case arises from the grossly deficient legal advocacy provided by Rogow, et.al in all stages of their representation of Dr. Pierson before the 11th Circuit Appellate Court. Rogow, et.al negligence and legal malpractice was a primary contributing cause to the failure of the appeal before the 11th Circuit. His significant omissions resulted in the premature release of multiple defendants in that matter during the appeal phase. It resulted in critical failure to include the participation and appearance of Federal and Florida State officials in the appeal on the issues raised with respect to the unconstitutionality of the Healthcare Quality Improvement Act of 1986 and relevant Florida State peer review statutes. These errors and omissions resulted not only in a failure of the case at the level of the 11th Circuit Appellate Court, but also resulted in the development of a deficient appellate record which completely eliminated any potential whatsoever for fair consideration of an appeal before the Supreme Court of the United States.

## SECTION II. PARTIES

3. Plaintiff Raymond H. Pierson, III, M.D. ("Plaintiff" or "Dr. Pierson") is an individual who is licensed to practice medicine and board certified in the surgical specialty of orthopedic surgery. Presently, Dr. Pierson resides and practices orthopedic surgery in Jackson, California. At all times relevant to the allegations in this complaint Dr. Pierson was licensed to practice medicine in the State of California and Board Certified by the American Board of Orthopedic Surgery in the specialty of orthopedic surgery. Dr. Pierson practices as a sole proprietor. Dr. Pierson has filed this complaint to recover in his own right individually for the substantial damages that resulted from the negligent legal representation provided by Rogow, et.al.

4. Defendant Bruce S. Rogow, J.D. is an attorney licensed in Florida who on information and belief has practiced through a Professional Association ("P.A.") at all times relevant to his legal representation of Dr. Pierson in this appeal before the 11th Circuit. He provided legal services at Broward Financial Center, Suite 1930, 500 East Broward Blvd. Fort Lauderdale, FL 33394. On information and belief Attorney Rogow can be served by delivering a copy of this complaint to the above referenced address.

5. Defendant, Cynthia Gunther, J.D., (hereinafter "Gunther") is an individual and an attorney licensed to practice law in Florida who worked as an Associate of Attorney Rogow's during at least part of the time period that Dr. Pierson was represented. She has an office in Fort Lauderdale, Florida – Cynthia Gunther, J.D., Gunther Law, LLC, 1 East Broward Blvd. Ste 700, Fort Lauderdale, FL 33301-1876.

6. Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as Does 1 through 5, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of Does 1 through 5, inclusive, when Plaintiff ascertains the identity and roles of such Defendants. Plaintiff is informed and believes, and thereon alleges, that each of these Defendants is

responsible in some manner for the acts and omissions which damaged Plaintiff, and that Plaintiff's damages as alleged herein were proximately caused by their errors or omissions.

7. Plaintiff is informed and believes and thereon alleges, that at all times herein mentioned, each of the Defendants, and Does 1 though 5, and each of them, were the agents and/or employees of each of Attorney Bruce S. Rogow and his P.A., and in doing the things herein alleged, were acting within the course and scope of said agency and/or employment, in that the actions of each of the Defendants is herein alleged were authorized, approved, and/or ratified by Attorney Bruce Rogow and his P.A. as principals and/or employees.

8. At all time herein mentioned, Defendants Rogow, Gunther, and Does 1 through 5, (hereinafter referred to inclusivity "Rogow, et.al.") and each of them, were, and now are, attorneys at law, duly admitted and licensed to practice law in the State of Florida, and doing business in Fort Lauderdale, Florida.

SECTION III. FACTS OF THE LEGAL REPRESENTATION

9. In a retainer agreement dated December 6, 2013 Rogow, et.al confirmed his "...*engagement as your Appellate Counsel in the United States Court of Appeals in the above styled case.*" Dr. Pierson agreed to these terms as evidenced by his December 7, 2010 signature on this retainer agreement and his forwarding of two checks totaling $33,000 as the initial installment for this representation and related court costs. The final installment was forwarded to Rogow, et.al on January 5th, 2011 for 170,000 dollars and sent via FedEx overnight. At all times prior to and during his involvement in representing Dr. Pierson before the 11th Circuit Court of Appeals Rogow, et.al held himself as not only competent but exemplary in the area of Appellate law and representation before Federal Appellate panels. He indicated that he had extensive experience before the 11th Circuit Federal Appellate Court as well as experience before the Supreme Court of the United States. At all times during Rogow, et.al's involvement in this representation before the 11th Circuit Court of Appeals Dr. Pierson and Rogow, et.al acted under an attorney/client relationship in which Defendants undertook to represent not only Dr. Pierson and Joanne R. Werntz, M.D. interests but also the important issue embodied within the case of early patient access to timely surgical intervention when acutely injured in the Central Florida region when treated at Orlando Regional Medical Center, the regions only level I trauma center. It must be emphasized that this was the level of access to care being denied patients by this Medical Center despite such care being available routinely at level I trauma centers nationally. Rogow, et.al gave full confidence that his representation would be exceptional in this regard. He also provided full confidence that the had a full understanding of the tremendous significance of these important public health related issues embodied within this case.

10. Rogow, et.al based upon the agreement to represent Dr. Pierson were required to exercise the specialized appellate law legal skill necessary for implementing a strategy and representation before the appellate court that would optimize the potential of Dr. Pierson

to achieve all of his legal goals. At all times during Rogow, et.al's involvement in this appellate matter, Dr. Pierson made it completely clear that he not only wanted an effort that would optimize the potential for restoring the case to the District Court level for trial by jury but also in the event of an adverse decision at the 11th Circuit to ensure that the case and the constitutional questions were optimally positioned for an appeal to the U.S. Supreme Court. As a fiduciary of Dr. Pierson's interests Rogow, et.al was obligated to zealously represent Dr. Pierson's interests as well as the important healthcare related issues of the citizens of Central Florida who become acutely injured and are denied timely surgical care when taken to Orlando Regional Medical Center. These obligations required that he provide the obligatory time investment to obtain a full and detailed working knowledge of all aspects of the underlying complex litigation including the constitutional challenges to the Federal Healthcare Quality Improvement Act statute and related Florida state statutes concerning peer review and peer review immunity. It required that he use this knowledge of the case and these areas of Federal and State law to plan a strategy that would optimize the potential for success and in the alternative to prepare the case for presentation in the most optimum format with the best potential for success at the United States Supreme Court. At all times, Rogow, et.al gave full confidence to Dr. Pierson that he was prepared to make these time investments and to achieve this level of knowledge of the case and the relevant areas of Federal and Florida State constitutions and statutes.

11. In the course of handling this representation of Dr. Pierson before the 11th Circuit Court of Appeals, Rogow, et.al was grossly negligent and failed to act with the degree of competence generally possessed by attorneys who handle Appellate matters before Federal circuits and the U.S. Supreme Court. This is despite the fact that Dr. Pierson paid Rogow, et.al a substantial sum of money (in excess of $200,000) for the sole purpose of providing legal representation in this matter. In fact, Rogow, et.al was paid a sum which exceeded the combined total of all legal fees paid to the three independent law firms representing the three independent Appellee parties in opposition.

## SECTION IV. JURISDICTION AND VENUE

12. This action arises under the laws of the United States due to diversity jurisdiction under 28 U.S.C Code Paragraph 1332 Subsections (a)(1) and (c). Dr. Pierson is a full time resident of California where he has lived and worked since September 2004. At all times during the representation of Dr. Pierson by Rogow, et.al and Associates in this appeal Dr. Pierson was a fulltime resident of Northern California where he has resided in Sutter Creek and worked full time at his private orthopedic surgical practice in Jackson, California. In contrast, at all times during his representation of Dr. Pierson in this matter, Rogow, et.al resided in Florida and worked at his legal practice based in Fort Lauderdale, Florida. The amount in controversy as alleged and more fully described herein far exceeds $75,000, excluding interest and costs.

## SECTION V. FACTS COMMON TO ALL COUNTS

13. In the underlying civil litigation case # 6:08-CV-466-ORL-2AGJK filed in the United States District Court, Middle District of Florida, Orlando Division, Dr. Pierson was a Plaintiff in the case initiated against Orlando Regional Health System and multiple peer review physicians who participated in a malicious sham peer review action against Dr. Pierson related to his practice at Orlando Regional Medical Center and Dr. Phillips Medical Center which were both institutions controlled and operated by Orlando Health. The action was taken by Dr. Pierson to challenge a malicious sham peer review action taken against him which was entirely motivated for the purpose of conspiring to restrain competition, inhibit trade, and for denial of constitutional rights. The litigation was brought for violations of antitrust law by the defendants who initiated conspiratorial activities against Dr. Pierson with the intent of restraining trade in the Central Florida regions only level I trauma center at Orlando Regional Medical Center where Dr. Pierson was a participant on the orthopedic surgery trauma and emergency on-call schedule. It also concerned anticompetitive conspiratorial activities designed to eliminate the Physician Patient Alliance™ a Management Service Organization/Independent Provider Association (MSO/IPA) planned and developed by Dr. Pierson and his then spouse Joanne R. Werntz, M.D. and their corporations. The suit was composed of many counts including contract violations related to repeated Hospital Bylaw violations by defendants. The suit also sought declaratory judgment that the Federal Healthcare Quality Improvement Act of 1986 and relevant Florida State peer review immunity and Florida State peer review privilege statutes were unconstitutional. In addition, Dr. Pierson also sought injunctive relief as well as damages for other related tort and contract claims.

## SECTION VI. DR. PIERSON'S EDUCATION, TRAINING, AND BACKGROUND

14. Dr. Pierson attended Temple University School of Medicine and graduated second in his class with "honors" on May 29, 1980. At Temple Dr. Pierson was one of five students selected to the Alpha Omega Alpha National Medical Society in his junior year. After graduation from Medical School he participated in a rotating internship at Harbor/UCLA Medical Center in Los Angeles, California. This internship was completed on June 23, 1981.

15. Following completion of his internship Dr. Pierson practiced one year as an emergency room physician at Phoenixville Hospital in suburban Philadelphia.

16. In July 1982, Dr. Pierson entered a four year orthopedic surgery residency program in New York City at the Hospital for Special Surgery/Cornell University Medical Center, which is the consistently nationally top ranked orthopedic surgery residency training program. Dr. Pierson completed this four year program on June 30, 1986. He then entered an adult reconstruction fellowship (total joint replacement surgery fellowship) at Rush Medical College in Chicago for one year. Following completion of that fellowship, Dr. Pierson participated in a traveling fellowship in sports medicine at three nationally prominent centers: Hospital for Special Surgery/Cornell University of Wisconsin, Madison and Cincinnati Sports Medicine.

17. After fellowship training Dr. Pierson was selected to become a member of University Orthopedics and to remain on the academic teaching staff at Rush Medical College. He remained in academic medical practice for six and a half years post fellowship and achieved the rank of Assistant Professor of Orthopedic Surgery. While at Rush College Dr. Pierson was a member of the Sports Medicine section, the Total Joint Reconstruction section, and also served as the Director of the Fracture section during the final phase of his career at that institution.

18. In November 1993 Dr. Pierson left his practice and teaching position in Chicago to relocate to Orlando, Florida where he joined his then spouse Joanne R. Werntz, M.D., a hand and microsurgeon in the practice of orthopedic surgery. Dr. Pierson's goal was to set up an independent orthopedic practice and to establish himself as a premier orthopedic surgeon in Central Florida.

19. Following his arrival in Orlando, Dr. Pierson and Dr. Werntz immediately focused their efforts on establishing themselves as surgeons with a highly patient-centric practice model to deliver the highest level of healthcare utilizing the most advanced treatment methods available and to provide care in the most timely and humane manner. Following the application and credentialing process Dr. Pierson was granted full privileges at the above mentioned Orlando Healthcare institutions. As a member of the Orlando Regional Medical Center, Dr. Pierson was a participant on the trauma and emergency call schedules at both Orlando Regional Medical Center and Sand Lake Hospitals.

20. While practicing at the Orlando Health institutions referenced above, Dr. Pierson remained a relentless advocate for patient rights where he insisted that acutely injured patients be provided for ready access to his efficient and humane medical and surgical treatment. Dr. Pierson worked tirelessly to protect patient's rights within the healthcare system. It is his strongly held opinion that a high level of autonomy for physicians is required from hospitals in order to maintain the most unbiased, objective and independent judgment in the care and treatment of patients.

21. As a member of Orlando Health, Dr. Pierson strongly advocated for physician independence and preservation of physician rights within the healthcare system. This approach was viewed adverse by the hospital administration whose intent was to foster a physician dependency model. Dr. Pierson's personal philosophy on physician rights served as a basis for his motivation to create a more balanced environment in which physicians could provide patient care in Central Florida. This philosophy was a motivation for his efforts to create and establish the Physician Patient Alliance™ in the Central Florida region.

22. The Physician Patient Alliance™ was a physician patient centered, Management Services Organization/Independent Provider Association developed by Dr. Pierson and Dr. Werntz in which they both invested significant time, effort and expense with the expectation that it would provide the best environment for them and allied physicians to practice and provide the best healthcare alternative for patients in the Central Florida region.

23. While developing his orthopedic surgery practice and participating in the orthopedic surgery trauma on-call schedule at the regions only level I trauma center located at Orlando Regional Medical Center, Dr. Pierson continued the same practice model which he had participated in at Rush Medical Center, a nationally top ranked orthopedic training program. That model involved providing efficient early surgical management of acutely traumatized patients with the intent of providing the best outcomes while at the same time reducing risk of adverse outcomes and minimizing human suffering. This was a practice model utilized at most nationally ranked level I trauma centers and well supported by the relevant orthopedic literature. During the time period that Dr. Pierson participated on the orthopedic on-call schedule at Orlando Regional Medical Center he achieved patient outcomes that far exceeded that of all of his peers at that institution and Florida statewide. Dr. Pierson's patients treated with immediate surgical intervention recovered dramatically earlier than that of his peers resulting in his patients being discharged an average of two days earlier than any of his peers and 3 ½ days earlier than the average for his peers at Orlando Regional Medical Center which was the Central Florida regions only Level I trauma center. When compared to state averages his patients were discharged from the hospital a full four days earlier with no adverse increase in hospital related costs. It is important to emphasize that the above mentioned quality outcome measures were made by Orlando Health after their analysis of their internal data which they also compared to those results of other Florida State healthcare institutions.

24. Despite the demonstrated exceptional outcomes achieved by Dr. Pierson's patients, as confirmed by their own results, Orlando Health and the co-conspiring peer review physicians initiated a sham peer review action against Dr. Pierson. In that action they repeatedly violated their Medical Staff Bylaws and fraudulently misrepresented the facts of Dr. Pierson's care and treatment of patients. Despite multiple detailed reviews by Dr. Pierson of his treatment of patients as well as his extensive reviews of the relevant literature which corrected all of these fallacies and further confirmed the validity of Dr. Pierson's treatment method, the sham peer review was continued. This occurred despite the confirmation by Orlando Health that Dr. Pierson's results far exceeded that of all other orthopedic surgeons providing level I orthopedic trauma care in their health system. The sham peer review against Dr. Pierson which involved extensive Medical Staff Bylaw violations was continued over an extended period of seven years. This action severely compromised Dr. Pierson personally, professionally, financially, and placed tremendous strains on his marriage with Dr. Werntz. The result was to severely restrict and compromise the development of his private surgical practice. It also resulted in the complete destruction of the Physician Patient Alliance™, which was a primary goal of Orlando Health and defendant physicians from the outset. Due to the harm that Dr. Pierson sustained he was forced to seek a practice opportunity elsewhere and eventually relocated his practice to Northern California. He has practiced in Northern California since 2004 at Sutter Amador Hospital where he practices exclusively. At Sutter Amador there has been broad acceptance of his early surgical treatment management of acutely injured patients which has continued to yield excellent outcomes and shorter lengths of stay than all of his peers at this institution. As a testament to the acceptance of his treatment approach, Dr. Pierson has served on the Medical Executive Committee three

out of the past six years at Sutter Amador Hospital, including a term as Chief of the Medical Staff.

25. From the time of the initiation of this sham peer review action against Dr. Pierson in November of 1996, Dr. Pierson worked tirelessly through the fraudulent administrative process of the peer review as managed by Orlando Health and the participating peer review physicians with the intent of not only clearing his name and restoring his professional and financial viability, but also to restore access of the acutely injured patients in the Central Florida region to the time critical early surgical interventions which they required in the management of their injuries. Unfortunately, it was evident to Dr. Pierson from the outset of the peer review process initiated against him that the institution and participating peer review physician's were motivated purely for financial and anti-competitive reasons. Through the process of fraudulently misrepresenting the information concerning the treatment that Dr. Pierson provided his patients and with repeated violations of their Medical Staff Bylaws over a prolonged seven year period the peer review was concluded in a manner unfavorable to Dr. Pierson. The outcome resulted in a permanent restriction of his on-call and trauma related privileges at Orlando Healthcare institutions. Under the Healthcare Quality Improvement Act of 1986 this determination necessitated an *"adverse action report"* to the National Practitioner Databank. This report, to this day and in perpetuity, will continue to defame Dr. Pierson and label him as a substandard physician. This is despite the fact that all patient care information from Orlando Health indisputably provides confirmation that his practice at that institution was exemplary and achieved better outcomes than all of his peers.

26. In order to expunge this fraudulent action on his record and to restore his good name Dr. Pierson sought relief in Federal Court in the Middle District of Florida with submission of his original complaint on January 27, 2008 (case # 6:08-CV466-0RL-28GJK). A significant motivation behind this litigation was to address unconstitutional issues with respect to the Healthcare Quality Improvement Act of 1986 and with respect to the relevant peer review and immunity statutes of the State of Florida. A significant component of the original complaint concerned addressing these unconstitutional issues. The constitutional counts within the complaint were authored by Neal Katyal, J.D., a nationally recognized expert in constitutional law, Professor of Law at Georgetown University Law School and subsequent Acting Solicitor General of the United States of America. The incorporation of these constitutional issues came at the substantial financial cost of well over 225,000 dollars. Mr. Katyal presented oral argument on the constitutional issues before the District Court in August of 2008. Representatives from the State of Florida and the U.S. Department of Justice were present at that oral argument and provided the governments counter arguments. Unfortunately, Judge Antoon dismissed the constitutional claims with prejudice on April 28, 2009 (Document 201). The Antitrust claims which were incorporated within the complaint were also dismissed with prejudice in that same order. Subsequently, most other counts of the case were dismissed in an order dated April 6, 2010 (document 315). The final two remaining counts which included Count One - breach of contract and Count Seven - a request for declaratory relief from the fraudulent National Practitioner Databank report were then

dismissed under summary judgment on October 27, 2010 (Document 364); thus, posturing the case for appeal before the United States Court of Appeals, 11th Circuit.

27. From the time of the initiation of the peer review action against Dr. Pierson in November 1996 through the entire peer review process and through the litigation up to the appeal stage it was always the well communicated intent of Dr. Pierson to challenge the constitutionality of the Healthcare Quality Improvement Act of 1986 and the relevant sections of Florida State peer review and immunity statutes up through the United States Supreme Court if necessary to overturn this unconstitutional legislation which has been so misused by Hospitals to restrict competition. In the hiring of Rogow, et.al in this case before the 11th Circuit Court of Appeals it was made perfectly clear by Dr. Pierson on all occasions of their being in contact that a significant emphasis and intent of the continued effort was to challenge the constitutionality of these laws from the perspective of violations of due process, equal protection, 10th Amendment Federalism principles, and the impermissible delegation of United States Constitutional Article III functions, as well as similar Florida State prohibitions against the delegation of government judicial powers to private entities. In this regard at the outset Rogow, et.al gave full confidence that he had the Appellate level expertise to pursue all aspects of the case including the constitutional claims before the 11th Circuit Appellate Court. To Dr. Pierson's great dismay during the period of Mr. Rogow's active involvement of representation before the 11th Circuit, and subsequently during Dr. Pierson's Pro Se filing of an *En Banc* petition to the 11th Circuit (Date 04/26/12) and a later filing of a *Writ of Certiorari* to the Supreme Court (Document 12-568) it became apparent that Rogow, et.al was grossly negligent in his representation of Dr. Pierson. This negligence was severe and involved multiple critical areas of the litigation which eliminated any potential that Dr. Pierson would be successful in the appeal before the 11th Circuit on these issues. In addition, Rogow, et.al's deficient and negligent representation completely closed the door on the potential for any relief at the Supreme Court level due to the severely inadequate and improper management of the case and presentation of the issues to the 11th Circuit Appellate Court. It is because of these issues that Dr. Pierson must seek relief before this court in an attempt to find relief from the tragic misfortune of this negligent representation by Rogow, et.al.

28. It must be emphasized that during Rogow, et.al's participation in the representation of Dr. Pierson in this appeal before the 11th Circuit he demonstrated a consistent pattern of lack of preparation and delayed submissions to the Court as documented by his repeated need to apply for time extensions both for submission of the initial brief and the subsequent reply brief. Two extensions of time were requested and granted for the submission of the initial brief and one extension of time was requested for the submission of the reply brief. In contrast, it should be noted that in the submission of three separate appellee briefs no single time extensions was required by any of the three independent parties that submitted briefs. In addition, he was woefully ill-prepared on the facts of the case and relevant case law at the time of oral argument on December 15, 2011. In fact, up through the time of his removal from this case Mr. Rogow demonstrated a consistent pattern of lack of preparation and absence of full knowledge of the issues of the case as demonstrated by his pattern of negligence in filings submitted to the 11th Circuit Court as

will be reviewed in detail below. In fact, the quality of Rogow, et.al's representation fell well short of even the minimum standards required of legal representatives at the Appellate level despite his repeated attestations that his expertise far exceeded that of his Appellate bar peers. Due to the severe deficiencies of Rogow, et.al's representation before the 11th Circuit Court of Appeals Dr. Pierson has been offered no alternative but to file this complaint to seek relief from this court.

## SECTION VII. FIRST CAUSE OF ACTION

(Legal Malpractice Against Bruce S. Rogow, J.D., Bruce S. Rogow, P.A, Cynthia Gunther, J.D. and Does 1 through 5)

**(Consistent Failures to Submit Timely Appellant Briefs to Court)**

29. Rogow, et.al, et.al developed an early pattern which was maintained throughout the case of repeated delayed filings of all actions to the Appellate Court. This involved two requests for extension of submission of the Appellant initial brief and one request for extension of the Appellant reply brief. Typical of this pattern Dr. Pierson was provided a copy of the brief to be filed in such a late time frame prior to the deadline for submission that Dr. Pierson was provided minimal to no opportunity to fully review the documents to be submitted. This late access severely limited and, in fact, eliminated the opportunity for Dr. Pierson to provide constructive comments or to point out significant omissions. In fact, even at those late hours Rogow, et.al was resistant to even having a significant discussion concerning the intended filings. It is important to note that opposing counsel for the three independently responding Appellees did not request a single time extension for submission of their briefs.

**(Omission of Defendants From Appeal)**

30. In the initial Appellant brief Rogow, et.al, et.al neglected to include on appeal Musculoskeletal Institute DBA Florida Orthopedic Institute and Defendant Roy W. Sanders, M.D. who were Defendants throughout the entire underlying case on a number of the critical counts. This resulted in the Appellee brief of Dr. Sanders and Florida Orthopedic Institute citing this deficiency as their justification for exclusion from further consideration in the case as cited in their March 31, 2011 Appellee brief and resulting in their March 31, 2011 *"Motion to Impose Sanctions for Damages and Costs pursuant to Rule 38"* for their improper inclusion. This deficiency was acknowledged by Rogow, et.al and led to the motion by Rogow, et.al on April 26, 2011 titled *"Motion for Leave to File Response to File Motion for Sanctions Out of Time"* and the motion filed on May 17, 2011 titled *"Motion to Dismiss Appeal with Prejudice in Response to Motion Sanctions"* also filed by Rogow, et.al." This was further followed by a June 13, 2011 *"Motion for a Thirty day Extension to Resolve Motion for Voluntary Dismissal"* filed by Rogow, et.al. In addition, in the reply brief of Appellant submitted on May 17, 2011 Section 7, pg. 14 Rogow, et.al acknowledged *"The Appeal as to Musculoskeletal Institute, DBA Florida Orthopedic Institute and Roy W. Sanders will be voluntarily dismissed."* This significant

omission in the original Appellant brief significantly adversely effected Dr. Pierson's opportunity for recovery against these parties and exposed him to the motions for sanction as well as the July 18, 2011 *"Motion to Dismiss Appeal due to Voluntary Dismissal"* and *"Motion for Attorney Fees"* filed by Appellee. This then resulted in legal costs to Dr. Pierson that should never have occurred at this stage had Appellee appropriately been included in the case. This issue characterizes the incompetent, careless, and grossly deficient manner in which Rogow, et.al, et.al managed this appeal.

### (Failure to Represent the Defamation Claims Against All Defendants)

31. In the underlying litigation multiple physician Appellees were accused of defamation. All of these individuals participated in the processes which led to the "Adverse Action Report" which will be published in perpetuity by the National Practitioner Databank in Dr. Pierson's NPDB Report. In this initial Appellant brief Rogow, et.al, et.al excluded all physician Appellees and included only Orlando Regional Health System and the CEO of the health system, John Hillenmeyer. This significant omission is cited in the Physician Appellee brief submitted on March 30, 2011 on pg. 30 where it states, *"As with the underlying defamation claims that were dismissed and that Pierson has not appealed, this theory cannot proceed."* These claims of defamation were critcally important to the appeal and represented the most onerous claims against the physician Appellees. This is due to the fact that the serial republishing of this fraudulent information in the National Practitioner Databank Adverse Action Report represented ongoing defamation that will continue repeatedly into the indefinite future. Loss of these claims against the multiple physician Appellees had a significant adverse effect on the appeal and the potential for recovery.

### (Failure to raise the constitutional issues as fully developed by constitutional law expert, Neal Katyal, J.D. a Former Acting Solicitor General in the underlying litigation.)

32. In this regard the underlying litigation provided extensive discussion of the failures of the Healthcare Quality Improvement Act of 1986 and related Florida State peer review statutes as it relates to violation of due process, equal protection, the Tenth Amendment Federalism Principles, and impermissible delegation of judicial power as designated by the U.S. and Florida State Constitutions, and of the Commerce Clause of the U.S. Constitution. In oral argument in the underlying case the Commerce Clause claim was forfeited by Plaintiff. The other counts were very strongly pursued and well supported in the underlying litigation. In the appeal the due process and equal protection arguments were poorly developed and not substantiative. The reporting requirement of HCQIA as a violation of the tenth amendment Federalism Principles was reviewed. There, however, was no discussion of the important principle of impermissible delegation of judicial authority both at the Federal and State level to private actors. Therefore, this substantial constitutional claim was lost. This deficient handling of these important constitutional challenges concerning the constitutionality of the Healthcare Quality Improvement Act led to a complete disregard of these issues both at the time of oral argument and in the Appellate court January 13th, 2012 decision. In fact, there was no mention by the Appellate Court whatsoever of the constitutional issues raised in oral argument or their

subsequent decision. This deficient handling of the constitutional issues represents a complete disregard for the strong and repeated demands by Dr. Pierson that these issues be incorporated as essential and critical components of the appeal. This deficient handling of the constitutional claims at the 11th Circuit Appellate Court eliminated any potential for consideration of these issues by the United States Supreme Court.

### (Failure to include as parties to the appeal the relevant government actors concerning the constitutional issues as was done appropriately in the underlying case.)

33. In the underlying case the following were parties included as Defendants: United States of America, National Practitioner Databank, Michael O. Lovett, Secretary to the United States Department of Health and Human Services, Region 4 of the Department of Health and Human Services, the State of Florida, the Florida Health Department, and Florida Board of Medicine. Despite raising some of the constitutional issues within the context of the appeal Rogow, et.al did not perform the essential step of including government actors as parties to the appeal which was essential for the court to consider the constitutional issues raised on appeal and critical to develop an appropriate record for later submission of a *Writ of Certiorari* to the U.S. Supreme Court on the constitutional issues. This omission by Rogow, et.al occurred despite the fact that it was the absolute intent of Dr. Pierson from the outset of this litigation that these government actors be included as parties as so well demonstrated in the lower court case. The only other alternative would have been to formally give notice to the Appellate Court Clerk of the consideration of a constitutional question *"...when the United States or the relevant state is not a party."* As required under the United States Court of Appeals 11th Circuit, Rules of Appellate Procedure, pg. 160 FRAP 44. Under this requirement where the government is not a party and a constitutional issue is raised there is a requirement of the *"...questioning party must give written notice to the circuit clerk immediately upon filing the record or as soon as the question is raised in the Court of Appeals."* Even though this would have been the less favorable alternative from Dr. Pierson's perspective, this step also did not happen in the appeal as managed so deficiently by Rogow, et.al. Of note, even on the *"Civil Appeal Statement"* filed by Rogow, et.al under the section *"Nature of the Suit"* the entry for questions concerning the U.S. Constitution was not circled, again representing a failure to notify the Appellate Court of the constitutional issues raised. At great expense Dr. Pierson had included the constitutional issues challenging the Healthcare Quality Improvement Act as well as relevant Florida State statutes providing peer review protections in the underlying litigation. The advancement of these constitutional issues was a primary motivation of Dr. Pierson's proceeding with this Appeal. It must be emphasized that it was very clearly and persistently articulated by Dr. Dr. Pierson's to Rogow, et.al that these issues must be included as an essential part of the appeal. As evidenced by the above discussion Rogow, et.al was completely deficient in this regard. Despite including text concerning the constitutional issues they did not take the necessary steps to ensure that there would be credible consideration given to the constitutional issues raised. Therefore these issues based upon his improper presentation were completely disregarded and overlooked by the Appellate Court. This had the substantial and permanent effect of creating an improper Appellate record for subsequent appeal to the U.S. Supreme Court. This dealt a fatal blow to these essential issues within the case.

These omissions and deficient counsel provided by Rogow, et.al ensured that the constitutional issues would be eliminated and that the substantial investment made by Dr. Pierson to include them was all for naught. The failure of Rogow, et.al to appropriately pursue the constitutional issues raised in the underlying litigation and intended for consideration on appeal by Dr. Pierson resulted in the loss of any viable opportunity to challenge the constitutionality of HCQIA before the U.S. Supreme Court. Furthermore, this omission eliminated the potential of this case to bring public debate to the misuse of this legislation and the absolute immunity provided within it by hospitals to not only compromise well qualified physicians but also to compromise the quality and access to healthcare of patients by the elimination of competitors who are attempting to introduce more advanced methods of care. It is essential to emphasize the fact that the underlying lawsuit was initiated in large measure to not only correct the multitude of wrongs that had been done to Dr. Pierson but also to advance the opportunity for physicians such as Dr. Pierson to introduce new treatment methods into a healthcare community which would advance the quality of healthcare as well as the humanity of that care. Despite the evidence which demonstrated that Dr. Pierson's early efficient surgical treatment of patients led to much improved patient outcomes, reduced risk of complications, and reduced healthcare cost expenditure while also minimizing patient suffering Orlando Health, which had the regions only level I trauma center blocked this treatment model by the misuse of the peer review protections in HCQIA. Despite the indisputable benefits, Dr. Pierson's innovative practice model was stopped by the institution in large measure because of their intent to eliminate competition and because the efficient care model reduced their opportunity to over-charge patients due to the fact that unnecessary hospital days were eliminated and thus not billable. In summary, the mismanagement of the constitutional issues by Rogow, et.al resulted in an important loss of the opportunity for this case to foster an essential public debate on the access of acutely injured patients to timely surgical care.

**(Failure of Rogow, et.al to respond to and take action concerning Plaintiff's demand for pursuit of the appeal at the 11th Circuit in the event of an adverse decision by submitting an *En Banc* Petition.)**

34. Despite receiving notice of this request for further action from Dr. Pierson on December 21, 2011 in a 2:14 pm email, Rogow, et.al took no action from this notice through the time of his email communication to Dr. Pierson of the adverse decision by the 11th Circuit to Dr. Pierson on January 18, 2012. During this intervening time period of 28 days Rogow, et.al made no attempt to communicate with Dr. Pierson concerning this request and made no effort to prepare a petition for rehearing. Based upon this non-response it was Dr. Pierson's understanding that preparations were underway. It was only on January 26, 2012 that Rogow, et.al communicated his unwillingness to proceed with an *En Banc* Petition. This refusal occurred despite the evidence within the unpublished decision by the 11th Circuit panel that all facts that the Court had assumed to be true in their decision were in fact false. Thus, an *En Banc* Petition would have provided the opportunity for correction of the Court's misunderstanding of the issues and facts of the case. Despite the evidence that the Court's misunderstanding of the facts certainly contributed to their adverse decision Rogow, et.al expressed no willingness to proceed

with the effort of correcting this information and creating potential for a favorable outcome. This late decision by Rogow, et.al to offer no advocacy to Dr. Pierson at this stage, thirteen days following the decision, provided no timely opportunity for Dr. Pierson to obtain alternative counsel to do this; therefore, the only alternative available was for Dr. Pierson to proceed as a Pro Se Appellant. A substantial *En Banc* petition was subsequently submitted to the 11th Circuit filed Pro Se by Dr. Pierson on April 26, 2012. In this document Dr. Pierson not only fully corrected all the misrepresentations of fact in the earlier decision, but also provided substantial and full record evidence to support the corrections of the misstated facts. Rogow, et.al's unwillingness to proceed with the *En Banc* Petition which he characterized as *"…absolutely frivolous"* in a January 26, 2012 email is proven to be nonsensical when one reviews the substance of the *En Banc* Petition that was submitted. This represents a failure on the part of Rogow, et.al to perform his professional, ethical, and contractual duties to Plaintiff.

### (Failure to timely inform Plaintiff of the Appellant decision dated January 13, 2012.)

35. Rogow, et.al did not inform Plaintiff of this decision until five days following the decision on January 18, 2012. This significantly reduced the time frame for Dr. Pierson to respond with a petition for rehearing which placed at risk Plaintiff's opportunity and right to pursue all alternatives before the 11th Circuit. This also significantly limited the opportunity to find alternative counsel which placed Dr. Pierson and the case in an extremely compromised status. In addition, false statements were made by Rogow, et.al concerning the time period for submission of a petition for rehearing as communicated in his January 27, 2012 email responses to Plaintiff. In that response he indicated that the time frame for submitted petition for rehearing was 14 days when in fact it was 21 as stated in FRAP-35, pg. 136 United States Court of Appeals 11th Circuit Rules (December 1, 2006 Edition which was then applicable). This misinformation was communicated fraudulently by Rogow, et.al with the intent of eliminating any efforts by Dr. Pierson to submit a petition for rehearing with or without alternative counsel.

36. Furthermore, A false statement by Rogow, et.al in a January 27, 2012 email indicated falsely that the time had already expired for submission of a petition for rehearing. In that email Rogow stated *"in an earlier email I told you the timeframe for filing rehearing: 14th day from the 13th. So the time has expired. …"* This was patently false information communicated fraudulently by Rogow, et.al with the intent of eliminating Dr. Pierson's further consideration of a petition for rehearing.

### (Improper filing of Rogow, et.al's final motions in the case)

37. Two relief requests were included in the motion dated January 30, 2012. It was an improper format to include two relief requests within the same motion, necessitating refiling. The refiling was completed on February 1, 2012 when the motions were submitted as two separate motions which was the proper format. These errors simply complete the spectrum of evidence concerning the consistent substandard level of legal procedure utilized by Rogow, et.al in managing this appeal which further supports the

many underlying claims of negligence and legal malpractice that are presented above in this complaint.

## SECTION VIII. SECOND CAUSE OF ACTION

(Breach of Judiciary duty against Defendants Bruce S. Rogow, J.D. Bruce S. Rogow, P.A., Cynthia Gunther, J.D. & Does 1 through 5)

38. Plaintiff refers to incorporate here in the general allegations and allegations of the first cause of action in paragraphs one through 37 alleged herein and intend for these to be included in this consideration of this section on the violation of fiduciary duty.

39. Rogow, et. al owed Plaintiff a fiduciary duty to act at all times in good faith and in Dr. Pierson's best interest. They had a duty, among other things, to perform the services for which they were retained with reasonable care and competence. There was a duty to act in the highest and best interest of Dr. Pierson's at all times in order to optimize the chances of success and minimize the potential adverse consequences for Plaintiff. At no time during the period of representation by Rogow, et.al, et.al was there any repudiation of this fiduciary duty.

40. Rogow, et.al failed in their fiduciary duties and obligations to properly represent Dr. Pierson due to, but not limited to the acts and omissions reviewed in detail above. Despite Dr. Pierson's quite clear and repeated articulation of his intent for managing the case and Rogow, et.al's acknowledgment of this intent, Defendants were consistently ill-prepared and never expended appropriate or sufficient effort to fully understand the underlying litigation despite their charging an exceptional and exorbitant fee for the uniformly poor quality of work provided. These deficient acts so compromised this appeal that it was absolutely unwinnable at the 11th Circuit and U.S. Supreme Court levels.

41. Due to all of these adverse acts and omissions there was a unquestionable breach of fiduciary duty and breach of contract as legal representatives for Plaintiff in this appeal. This has resulted in the loss of the substantial work and investment that had been made in this peer review matter and subsequent litigation up to this point. This tragic circumstance represented a loss of 15 years of effort which included over 15,000 hours of Dr. Pierson's personal time. This had the effect of essentially tossing away the multimillion dollar investment that had been made in this case over this extended period of time in terms of hours worked, loss opportunity, legal costs, etc.

42. There is substantial evidence that these deficient acts and many omissions not only constituted breach of fiduciary duty and a failure to honor the professional legal duties to Plaintiff, but also demonstrate fraud, and even malice. Thus, in addition to all actual damages Defendant should be exposed to punitive damages. In summary, Plaintiff, Raymond H. Pierson, III, M.D. prays for judgment against Defendants as set forth below:

### As to the First Cause of Action

1. The actual damages in the sum in excess of 75,000 dollars which is within the jurisdiction of this court consistent with proof including the lost substantial investment made in the underlying case (case # 6:08-CV466-0RL-28GJK).

2. Interest as allowed by law.

3. The legal costs of this suit.

4. The legal costs owed to Defendants in the underlying litigation.

5. A full refund of fees paid by Plaintiff to Defendant for representation in the Appellate case.

6. Additional relief as deemed appropriate by this court including punitive damages.

### As to the Second Cause of Action

1. Actual damages in the sum in excess of 75,000 dollars which is within the jurisdiction of this court including the lost substantial investment made in the underlying case # 6:08-CV466-0RL-28GJK

2. Interests as allowed by law.

3. Costs for this litigation.

4. The legal costs owed to Defendants in the underlying litigation.

5. For other exceptional damages including punitive damages if permitted.

6. All other relief as deemed appropriate by this court.

Dated: January 31, 2014                    RAYMOND H. PIERSON, III, M.D., PRO SE

*/s/ Raymond H. Pierson III, M.D.*
RAYMOND H. PIERSON, III, M.D., PRO SE